Gordon Lubricating Company v. Commissioner.
Gordon Lubricating Co. v. Commissioner
Docket No. 94296. United States Tax Court
T.C. Memo 1965-132; 1965 Tax Ct. Memo LEXIS 198; 24 T.C.M. (CCH) 697; T.C.M. (RIA) 65132; May 18, 1965
*198 1. Debentures issued by taxpayer corporation to its stockholders and related parties represented genuine indebtedness of, rather than any equity interest in, petitioner, and interest paid thereon is deductible by petitioner. 2. Certain advances made by petitioner to another corporation were converted to an equity interest in that corporation in 1951 when petitioner became the owner of 50 percent of its capital stock, and the loss incurred by petitioner on the advances was deductible as a capital loss rather than as a bad debt. 3. Petitioner failed to prove that the useful life of its assets used under a renewable contract with Gulf Oil Co. was limited to the initial term of the contract for purposes of computing depreciation. 4. Deductions for amortization of initial issue debenture bond discounts allowed. Paul G. Rodewald and John K. Barry, for the petitioner. Lawrence L. Wilson, for the respondent. DRENNEN
*199 Memorandum Findings of Fact and Opinion DRENNEN, Judge: [1] Respondent determined deficiencies in petitioner's income tax for the taxable years 1957, 1958, and 1959 in the respective amounts of $41,887.15, $44,965.91, and $37,273.38. *200 Several issues raised in the pleadings have been settled either by stipulation or by concession and can be given effect in the Rule 50 computations. The following issues are the only issues remaining for decision: (1) Whether amounts claimed as interest paid on petitioner's debentures are deductible as interest paid on indebtedness within the meaning of section 23(b), I.R.C. 1939, and section 163(a), I.R.C. 1954. (2) Whether petitioner's loss in 1958 in the amount of $40,000 for funds advanced to Norman Oil & Supply Co. is deductible as a business bad debt or as a capital loss on an investment. (3) Whether petitioner may depreciate a portion of its assets in 1957, 1958, and 1959 based upon a useful life measured by the initial period of a renewable servicing contract where such assets have a useful physical life greater than the initial term of the contract. A fourth issue, whether petitioner is entitled to deductions for amortization of original issue discounts on some of the debentures issued, will be decided by our decision of the first issue mentioned above. Findings of Fact The facts pertinent to the issues remaining for decision, consisting *201 principally of the general history of petitioner's operations over an extended period and its methods of financing, are complex and extensive. Some of the facts and numerous exhibits have been stipulated by the parties. The stipulated facts are found as stipulated and facts contained in the various exhibits received in evidence are incorporated herein by reference. We relate below the principal facts necessary to a decision of the issues involved, as we have found them. Petitioner was incorporated in Pennsylvania under the name of Gordon Lubricating Co. [2] on February 11, 1935, with an authorized capital stock of $25,000, consisting of 2,500 shares of common stock without par value, but having a stated value of $10 per share, with its principal office then located in Pittsburgh, Pa., and presently located at McKees Rocks, Pa. Its returns for the periods here involved were timely filed with the district director of internal revenue, Pittsburgh, Pa. At all times relevant herein petitioner kept its books and filed its calendar year Federal corporate income tax returns on the accrual method of accounting. *202 Petitioner was originally organized to manufacture, buy, and sell oil, grease, and lubricating materials as well as their byproducts and constitutent parts. Prior to petitioner's incorporation Robert M. Gordon (hereafter referred to as Gordon) had developed a lubricating system for rolling mills and specially formulated greases to be used in the system. The system had wide acceptance and was used in major manufacturing plants in this country and in England. Petitioner was formed to promote and market this system. On its incorporation, Gordon transferred the formula and his system to petitioner in exchange for stock of petitioner. Gordon was president and chief executive officer of petitioner from its inception in 1935 until his death in 1962. Gordon apparently had no capital with which to promote his system; however, he was able to interest Robert H. McClintic (hereafter referred to as McClintic) and Earle J. Patterson (hereafter referred to as Patterson), both men of considerable wealth, to aid him in financing the project. Pursuant to an agreement made prior to the inception of petitioner, McClintic and Patterson were issued stock in petitioner for assisting petitioner in obtaining *203 financing. Gordon's brother John was issued 15 shares of petitioner's stock as part payment for legal services performed in incorporating petitioner. The original stockholders of petitioner were Gordon, McClintic, and several others, but shortly after its inception Patterson became a substantial stockholder. Gordon, McClintic, and Patterson, and persons related to them, were the principal stockholders of petitioner until Patterson withdrew in 1949, after which time Gordon and McClintic, and persons related to or associated with them, continued to be the principal stockholders. As of March 1, 1946, there were 2,160 shares of petitioner's common stock outstanding, held: 835 shares by Gordon and his relatives; 845 shares by McClintic; 380 shares by Patterson and his relatives; and 100 shares by F. Lauer, treasurer of petitioner until 1949. Petitioner's initial paid-in capital was $500. Shortly after incorporation petitioner leased certain premises in Carnegie, Pa., to permit the manufacture of greases which it sold to rolling mills in the Pittsburgh area. At approximately the same time petitioner was approached by representatives of the California Oil Co (hereafter referred to as California) *204 to handle their so-called RPM oils. Petitioner was to act as a wholesale distributor for California, entering into dealerships with others in Pennsylvania and West Virginia. During the period following, which extended up to 1948, petitioner warehoused and manufactured selected products of California at its plant in Carnegie, reshipping the products to dealers established pursuant to the agreement between California and petitioner. Between 1935 and 1946 petitioner enjoyed some small measure of success; as of January 1, 1946, it had assets with a book value of $72,771.98, capital stock outstanding with a stated value of $22,100, and earned surplus of $8,164.53. During this period McClintic and Patterson had not only assisted petitioner in obtaining loans from outsiders by guaranteeing the loans and putting up securities as collateral therefor, but had also made loans to petitioner from time to time which had been repaid with interest. Gordon received a modest salary from petitioner and devoted his full time to petitioner; he also had an agreement whereby he was entitled to 10 percent of petitioner's net profits, which agreement was canceled in 1950. McClintic and Patterson were both *205 officers and directors of petitioner. About 1945 petitioner's principal stockholders decided to expand petitioner's business. During 1945 petitioner had discussions with Culligan Zeolite Co. of Northbrook, Ill., in an effort to obtain a franchise permitting petitioner to purchase, certain water-conditioning equipment, operate the equipment in the Pittsburgh area, and supply customers with the so-called Culligan soft water service for specified contract charges. By late December 1945 an agreement between the parties was concluded, and the water-softening service was undertaken from petitioner's leased premises in Carnegie, Pa., early in 1946. In order for petitioner to begin its new water-softening operation, a substantial amount of money was required to purchase the franchise, the cylinders to be used in the homes of customers, the equipment to regenerate the cylinders, and the other equipment and facilities necessary to begin the operation. Approximately $135,000 was expended during 1946 for such franchise and equipment, and an additional amount approximating $160,000 was expended in 1947 for equipment and cylinders. It is not clear from the record how this money was obtained *206 but it appears that a part of it at least was borrowed from Peoples First National Bank & Trust Co. of Pittsburgh (hereinafter referred to as Peoples). At the time petitioner was negotiating for the Culligan franchise, petitioner's officers and California discussed plans whereby petitioner's facilities would be greatly expanded to store and manufacture California's products for distribution through dealers established by petitioner in the western Pennsylvania and West Virginia area. During these discussions California furnished petitioner with projections of the greatly increased volume of business anticipated from which petitioner could expect large profits. To enable petitioner to handle this anticipated increase in business it became necessary for petitioner to expand its storage and manufacturing facilities. During 1946 petitioner embarked on a program to expand these facilities and efforts were undertaken to acquire property suitably located and of sufficient size upon which a terminal and other facilities might be constructed. At a meeting of its stockholders on November 29, 1946, action was taken to change petitioner's authorized capital stock from $25,000 divided into 2,500 *207 shares of no par value to $30,000 divided into 30,000 shares of $1 par value. Each of the old shares of petitioner was exchanged for 10 shares of the new stock, after which the Gordons owned 8,350 shares, McClintic owned 8,450 shares, the Pattersons owned 3,800 shares, and Lauer owned 1,000 shares. At the same meeting action was also taken authorizing an increase in petitioner's indebtedness from zero to $500,000, and petitioner was authorized to issue documents denominated as "4 1/2% Debentures, due December 1, 1966" in the aggregate principal amount of $500,000. The terms of these debentures will hereinafter be discussed more fully. A resolution was also adopted providing that purchasers of the debentures would be given the opportunity to subscribe for the newly authorized stock at the rate of 10 shares for each $1,000 principal amount of debentures purchased, at the subscription price of $1 per share, its par value. Petitioner's officers were authorized to issue $150,000 principal amount of the debentures to each of McClintic and Patterson upon payment by them of $150,000 each to petitioner, and to issue the remaining debentures to a restricted list of friends and prospective *208 investors in the company. [3]
In November 1947 petitioner acquired property in McKees Rocks, Pa., from Fidelity Trust Co. (hereinafter referred to as Fidelity) and others, as trustees *209 under the will of Howard H. McClintic, father of McClintic, and erected a tank storage terminal and grease plant on this property. The $25,000 purchase price for the property was paid by issuance of $25,000 principal amount of the above-mentioned debentures, payment of which was guaranteed by McClintic. Petitioner arranged for financing the cost of the new terminal and other facilities by borrowing an additional $300,000 from Peoples, with the understanding that another $300,000 would be provided by petitioner. Contemporaneously therewith petitioner entered into an operating agreement with California under which petitioner agreed to build the terminal facilities and grease plant at McKees Rocks for handling California's products and California agreed to pay petitioner 3 cents per gallon for lubricating oil and 1 1/4 cents per pound for grease shipped by Gordon for California. The term of the agreement was 10 years after September 1, 1958. Petitioner gave Peoples a note for $300,000 which was guaranteed by California, Gordon, McClintic, and Patterson, which was to be paid over a period of 10 years at guaranteed minimum amounts per year or at the rate of 1 cent per gallon of oil and *210 1/2 cent per pound of grease put through petitioner's plant under the operating agreement with California. Petitioner also issued a bond to California, secured by a mortgage on its property, requiring the payment of the same $300,000 borrowed from Peoples. The remaining $300,000 required to be provided by petitioner had been raised by selling the $300,000 principal amount of debentures to McClintic and Patterson. A misunderstanding arose under the wording of the resolution authorizing issuance of the debentures (see fn. 3) as to whether McClintic and Patterson were entitled to subscribe for additional stock pursuant to their purchase of the initial $300,000 of debentures, as a result of which the 1,500 shares of stock which they each claimed to be entitled to purchase were not issued until 1948. Resolution of this controversy was settled by an agreement dated October 11, 1948, between Gordon, McClintic, and Patterson to the effect that McClintic and Patterson could each purchase 1,500 shares of stock for $1,500 and Gordon was granted an option to purchase 2,000 shares at par value sometime in the future, but not until the sinking fund for the debentures and interest thereon were *211 current. The option was granted to Gordon so he could continue in his efforts to make petitioner successful, and also in an effort to equalize his equity holding in the company. The revenues which California estimated would develop under the distributorship contract with petitioner did not materialize because California failed to supply the minimum volume of oil and grease for processing at petitioner's plant which had been projected and which was essential for petitioner to meet its debt obligations incurred in financing the construction of the terminal facilities. In 1949 California offered to cancel the contract and purchase the McKees Rocks property, but petitioner did not want to go out of business so an agreement was worked out under which California leased the property from petitioner for a period of 8 years, paying sufficient rent and service fees to petitioner to assure that its debt to Peoples could be liquidated as it became due. At about the same time, in late 1949, Patterson formed a new corporation called Culligan Soft Water Service of Pittsburgh, Inc. (hereinafter referred to as Culligan), for the purpose of acquiring petitioner's water-softening business, which *212 had been operated as a separate division of petitioner. An agreement was executed under which Culligan purchased the assets attributable to petitioner's water-softening business, including accounts receivable, inventories, deposits, and fixed assets, for $235,077.03, and petitioner's water-softening franchise for $216,977.92. The purchase price was paid by Culligan's transferring to petitioner $238,000 face amount of petitioner's debentures, which it had acquired from Patterson in exchange for its stock, by assumption of $133,140 of indebtedness owing from petitioner to Patterson, and $64,580.65 indebtedness owing by petitioner to Peoples in connection with the water-softening business, and by certain other payments. Culligan paid petitioner only $4,574.87 in cash in the transaction. Patterson thereupon resigned as an officer of petitioner and petitioner bought its stock owned by Patterson and his associates, totaling 7,160 shares of $1-par-value common stock, for 25 cents per share. Prior to March 13, 1951, with the consent of California, petitioner had been negotiating with Cities Service Oil Co. (hereinafter referred to as Cities Service) to provide manufacturing, storage, and *213 distribution services for Cities Service from its plant at McKees Rocks. As a result thereof petitioner and Cities Service entered into a 10-year lease and operating agreement for the above purpose on March 13, 1951, effective May 1, 1951. By mutual agreement between California and petitioner, petitioner reoccupied the McKees Rocks terminal on May 1, 1951, and thereafter petitioner began to manufacture and package grease, as well as to blend, compound, package, and distribute oil for Cities Service. In addition, petitioner received, stored, and loaded gasoline for Cities Service. Repossession of the McKees Rocks property by petitioner from California was preceded by an arrangement whereby petitioner's indebtedness to California was paid, and contractual obligations with California were terminated. This was accomplished by petitioner's increasing its line of credit from Peoples up to $800,000, secured by a mortgage on its property and the guarantee of McClintic and Gordon. A part of the rental payments under the operating agreement with Cities Service was also assigned to Peoples to secure the notes. From time to time thereafter petitioner borrowed money from Peoples under this arrangement. *214 In 1953 petitioner also borrowed $53,000 from Cities Service for construction of additional warehouse space and gave Cities Service a second mortgage on its property. The 1951 operating agreement with Cities Service anticipated that petitioner would provide some terminaling services for others. This provision was designed to permit Gulf Oil Corp. (hereinafter referred to as Gulf) to use the McKees Rocks terminal once an agreement as to the details could be reached by Cities Service and Gulf. Such an agreement was finally reached in the fall of 1953. Thereafter Cities Service continued for awhile as petitioner's major customer with Gulf as its secondary customer. During 1956 petitioner's arrangement with Cities Service was also proving unsatisfactory because, similar to the situation which developed with the distribution of California's products, Cities Service did not generate a sufficient volume of business to make terminaling of lubricants and gasoline profitable. On the other hand Gulf had a high potential volume but was reluctant to utilize the large oil terminaling and grease facilities at McKees Rocks because of the presence of Cities Service employees who might possibly *215 gain access to Gulf's secret formulas. On April 6, 1956, petitioner arranged to have Cities Service accept a new operating agreement reducing petitioner's service to Cities Service to the terminaling of gasoline only. On April 6, 1956, petitioner also entered into an operating agreement with Gulf for a term of 5 years beginning May 1, 1956, with an option given to Gulf to renew the agreement for an additional 5 years. The services to be performed by petitioner for Gulf were primarily those of manufacturing, blending, receiving, storing, packaging, and loading Gulf's products. Petitioner attempted to negotiate an original term for the agreement of 10 years but Gulf was unwilling to commit itself for longer than 5 years. In 1957, at petitioner's request, the agreement was extended for a period of 2 years (to May 1, 1963) with Gulf having an option to renew for an additional 5-year period (from May 1, 1963). In conjunction with petitioner's curtailment of its servicing contract with Cities Service and its agreement to provide extensive services for Gulf, arrangements were made whereby most of petitioner's obligations to Peoples were paid and terminated and Mellon National Bank & Trust *216 Co. (hereinafter called Mellon) extended petitioner a line of credit in the amount of $580,000. The loan from Mellon was to be evidenced by a note, payable in 60 monthly installments of slightly less than $11,000 each, guaranteed by McClintic and Gordon, and secured by a mortgage on petitioner's property. Under the bank loan agreement with Mellon the owners of all of petitioner's outstanding debentures subordinated them to the Mellon loan, and all debentures that might be issued in the future were also to be subordinated to the Mellon loan, and it was agreed that no payments would be made to the debentureholders until the indebtedness to Mellon was paid in full, except that interest could be paid on the debentures so long as there was no default by petitioner under the bank loan agreement. The debentureholders also agreed not to take any action to enforce or collect on the debentures until the Mellon loan was paid in full, without the written consent of Mellon. It was also a condition to obtaining the Mellon loan that petitioner should enter a valid and binding agreement with Gulf covering the performance by petitioner for Gulf of the above services, under the terms of which agreement *217 petitioner was entitled to minimum payments from Gulf of $16,500 per month, of which approximately $11,000 per month was assigned by petitioner to Mellon to meet the payments on the bank loan. Petitioner continued to operate profitably under the Gulf agreement up to the time of trial. In 1960 Gulf and petitioner agreed to extend the operating agreement to November 30, 1968, with an additional 5-year option to renew being granted to Gulf. The Mellon loan was paid in full by 1960. On July 11, 1963, Cities Service terminated its gasoline terminaling contract with petitioner. At all times relevant herein petitioner carried on its independent operation involving the manufacturing, packaging, and shipping of its own petroleum products, and also performed some terminaling services for Shell Oil Co., Boron Oil Co., and others, but by far the greatest part of petitioner's income since 1956 has been produced under its agreement with Gulf. Petitioner's facilities at McKees Rocks constitute one of the largest independent terminaling facilities between Pittsburgh and the east coast. Issue 1. Interest Deduction Additional Findings of Fact This issue involves the deductibility of interest *218 paid on the 4 1/2-percent debentures due December 1, 1966, first authorized and issued by petitioner in connection with the expansion of its business and facilities in 1946. The total principal amount authorized was $500,000. The debentures involved were issued in denominations of $1,000 each and are transferable by the registered owner thereof at the office of the company. The principal amount of all the debentures is due December 1, 1966, and they bear interest at the rate of 4 1/2 percent per annum, payable semiannually. They constitute a first but unsecured charge upon the assets and property of the company, subject to conditions provided therein; but said charge shall not be construed to limit any sale, etc., or other dealings by the company in the ordinary course of its business, provided the company shall not place any prior lien on its property without the consent of the holders of 60 percent in value of the outstanding debentures. The debentures contained a provision for creation of a sinking fund to redeem a part of the debentures prior to maturity. Annual payments of 5 percent of the aggregate principal amount of debentures outstanding were to be made to the sinking fund, *219 commencing February 1, 1952, and provision was made for notification and redemption of bonds each year at the face amount plus accrued interest. The company shall pay no cash dividends on its capital stock if it is in arrears with respect to any payment into the sinking fund. Upon liquidation of the company the claims of the registered owners of the debentures for unpaid principal and interest thereon shall rank ahead of and be paid prior to claims with respect to the capital stock of the company. The usual provisions for remedies available to debenture holders in the event of default were contained in the debentures; however, no remedy was available for default in interest or sinking fund payments unless the default had continued for at least 2 calendar years. The debentures also provided for subordination, as follows: (15) Anything in this Debenture to the contrary notwithstanding, the indebtedness evidenced by this Debenture shall be subordinate and junior to any and all indebtedness of the Company for money borrowed from commercial banks outstanding at the date hereof or which may be incurred hereafter, such indebtedness being herein referred to as "Superior Indebtedness. *220 " * * * During the continuance of any default in the payment of any Superior Indebtedness, no payment of principal or interest shall be made on this Debenture if notice of such default, in writing or by telegram, has been given to the Company. The debentures were regular in form and by their terms created an indebtedness from the company to the registered holders thereof. Debentures were used as a method of financing rather than the issuance of stock because Gordon was unable financially to participate in the financing but refused to permit his equity interest in petitioner to be diluted. Debentures were used to subordinate the obligations so created to all borrowings from commercial banks to permit petitioner to borrow from banks in the regular course of its business, but were to place the obligations created by the debentures on a par with obligations due to general creditors. The first $300,000 of the debentures to be issued were issued to McClintic and Patterson in 1946, in exchange for $150,000 in cash received from each of them, to enable petitioner to begin expanding its activities. On December 2, 1947, McClintic and Patterson each advanced $50,000 to petitioner and received *221 $50,000 face amount of petitioner's debentures. On the same day each advanced $500 to petitioner and received 500 shares of petitioner's common stock. On November 1, 1948, McClintic and Patterson each advanced an additional $36,000 to petitioner and received $36,000 face amount of petitioner's debentures. On the same day each purchased 360 shares of petitioner's common stock for $360. As previously noted, due to a misunderstanding between the parties as to whether McClintic and Patterson were entitled to purchase stock in connection with their purchase of the $300,000 in debentures, it was not until 1948 that McClintic and Patterson were each issued 1,500 shares of stock in exchange for $1,500 paid to petitioner. At the same time, Gordon was given an option to purchase 2,000 shares of petitioner's stock at sometime in the future for $1 per share. In 1955 Gordon did purchase $15,000 face amount of the debentures and also purchased 150 shares of petitioner's stock for $1 per share. In 1958 Gordon's two sons, Robert, Jr., and Thomas, were issued 1,500 shares of petitioner's stock between them, apparently in consideration of Gordon's cancellation of his option to purchase 2,000 shares. *222 In 1951 Pamela McClintic, a sister-in-law of McClintic, upon payment to petitioner of $250, was issued 250 shares of petitioner's stock in consideration of a loan of collateral by her in connection with a bank loan to petitioner by Mellon. On March 15, 1955, Wendell B. Gordon, a brother of Gordon, purchased $5,000 face amount of petitioner's debentures and on the same day also purchased 50 shares of petitioner's stock at $1 per share. Also in 1955 McClintic purchased 350 shares of petitioner's stock for $1 per share in consideration for having arranged a bank loan for petitioner's subsidiary, McClintic-Gordon Co. In 1957 petitioner sold $33,000 face amount and $69,000 face amount of its debentures to Herr & Co., nominee for the trustee of a trust established by the McClintic family, for a consideration of $30,533 and $60,000, respectively. At approximately the same time, 330 shares and 690 shares of petitioner's stock were also issued to Herr & Co., nominee as aforesaid. Petitioner's records did not reflect any consideration paid for the stock. The record herein indicates that the $33,000 in debentures were sold to Herr & Co. to permit petitioner to meet its obligations as guarantor *223 on a bank loan to Norman Motor Sales, Inc., and that the discount on these debentures was granted to cover the capital gains tax the trust would have to pay on securities sold to provide the cash to buy the debentures, but there is no explanation in this record for the discount given on the sale of the $69,000 face amount of the debentures. During the period 1951 to 1957, McClintic transferred 2,000 shares of his stock in petitioner to each of four irrevocable trusts which he had established for his four children. McClintic had no interest as beneficiary or trustee in any of the trusts. The trustee, Mellon, was directed to vote the stock held by the trusts in accordance with the instructions of McClintic's two brothers. A summary of holdings of petitioner's common stock and debentures is as follows: GORDON LUBRICATING COMPANY Summary Schedule of Holdings of Common Stock and 4 1/2% Debentures 1946 to 1959, Inclusive Total Out-
Fidelity
Mac
Herr
standing
Treas-
Trust
& Co.
& Co.
No. of
ury
Robert H.
Co. as
(Nomi-
(Nomi-
Shares
Stock
McClintic
Trustee
nee)
nee)
(Debentures
Dollars)
1946 21,600
8,450
(300,000)
(150,000)
1947 22,700
8,950
(428,000)
(201,000)
(25,000)
1948 26,420
10,810
(500,000)
(237,000)
(25,000)
1949 19,260
7,160
10,810
(262,000)
(237,000)
(25,000)
1950 19,260
7,160
10,810
(262,000)
(237,000)
(25,000)
1951 19,510
6,910
10,810
(187,000)
(187,000)
1952 19,510
6,910
6,810
4,000
(187,000)
(187,000)
1953 19,510
6,910
6,810
4,000
(187,000)
(187,000)
1954 19,510
6,910
6,810
4,000
(187,000)
(187,000)
1955 20,060
6,360
7,160
4,000
(207,000)
(187,000)
1956 20,060
6,360
7,160
4,000
(207,000)
(177,000)
(10,000)
1957 20,390
6,030
5,160
6,000
330
(309,000)
(177,000)
(10,000)
(102,000)
1958 22,580
3,840
3,160
8,000
1,020
(309,000)
(167,000)
(20,000)
(102,000)
1959 22,580
3,840
3,160
8,000
1,020
(309,000)
(147,000)
(40,000)
(102,000)
*224 Total Out-
McClintic
standing
Gordon
Gordon
No. of
Pam-
Stew-
Shares
ela
art
Rob-
Wen-
(Debentures
Robert
Mary
John
ert
dell
Dollars)
M.
P.
B.
M., Jr.
B.
1946 21,600
4,000
4,000
350
(300,000)
1947 22,700
4,000
4,000
350
(428,000)
1948 26,420
4,000
4,000
350
(500,000)
1949 19,260
4,000
4,000
350
(262,000)
1950 19,260
4,000
4,000
350
(262,000)
1951 19,510
250
4,000
4,000
350
(187,000)
1952 19,510
250
4,000
4,000
350
(187,000)
1953 19,510
250
4,000
4,000
350
(187,000)
1954 19,510
250
4,000
4,000
350
(187,000)
1955 20,060
250
4,150
4,000
350
50
(207,000)
(15,000)
(5,000)
1956 20,060
250
100
4,000
4,000
350
150
50
(207,000)
(15,000)
(5,000)
1957 20,390
250
100
4,000
4,000
350
150
50
(309,000)
(15,000)
(5,000)
1958 22,580
250
100
4,000
4,000
350
825
50
(309,000)
(15,000)
(5,000)
1959 22,580
250
100
4,000
4,000
350
825
50
(309,000)
(15,000)
(5,000)
Total Out-
standing
No. of
Shares
Patterson
(Debentures
Thomas
Fred
John
Dollars)
P.
Earl J.
Earl, Jr.
Lauer
Lucas
1946 21,600
2,700
1,100
1,000
(300,000)
(150,000)
1947 22,700
3,200
1,100
1,000
100
(428,000)
(202,000)
1948 26,420
5,060
1,100
1,000
100
(500,000)
(238,000)
1949 19,260
100
(262,000)
1950 19,260
100
(262,000)
1951 19,510
100
(187,000)
1952 19,510
100
(187,000)
1953 19,510
100
(187,000)
1954 19,510
100
(187,000)
1955 20,060
100
(207,000)
1956 20,060
100
(207,000)
1957 20,390
(309,000)
1958 22,580
825
(309,000)
1959 22,580
825
(309,000)
*225 Petitioner's books and records at all times reflected the outstanding debentures as liabilities. The sinking fund provided for retirement of the debentures was never established. No interest was paid on the debentures until 1949, at which time interest in the amount of $55,975.04 had accrued. Part of this accrued interest was forgiven by Patterson as partial consideration for his acquisition of the Culligan business in 1949. After payment or discharge of interest in 1949, the balance of unpaid interest accrued at the end of 1949 was $27,378.60. By the end of 1951 all accrued interest had been paid. During 1952 and 1953 interest accrued at the rate of $8,415 per annum and interest was paid in the amounts of $4,908.75 and $7,713.75 in 1952 and 1953, respectively, leaving an accrued unpaid balance of $4,207.50 at the end of 1953. During 1954 all accrued interest was paid and all interest due on the debentures has been paid currently in each year beginning with 1954 and extending through 1962. The debentureholders have never taken any action with respect to any defaults in payments of interest on the debentures or payments into the sinking fund. The $238,000 in face amount of debentures *226 issued to Patterson were delivered to petitioner by Culligan as part consideration for the purchase of the Culligan business in 1949 and these debentures were retired and canceled. In 1951 petitioner repurchased at face value and retired the $25,000 of debentures that had been issued to Fidelity in exchange for the McKees Rocks property. In 1951 petitioner also repurchased at face value and retired $50,000 in face value of the debentures previously issued to McClintic. These purchases were contemporaneous with petitioner's acquiring an increased line of credit from Peoples at the time it entered into an operating agreement with Cities Service. Petitioner reported a net loss from its operations for each of the years 1946 through 1954, except for the years 1948, 1949, and 1951, in which it reported profits of $33,482.36, $4,809.31, and $14,064.79, respectively. As of December 31, 1954, petitioner's books reflected an earned surplus deficit of $142,068.13. Petitioner reported a profit from its operations for each of the years 1955 through 1962, and as of December 31, 1962, its books reflected an earned surplus of $100,793.72, paid-in capital surplus of $30,140.86, and common stock of *227 $26,420. As of December 31, 1962, its balance sheet also reflected assets of $1,198,142.91, including $85,577.10 in cash and $246,279.26 in Government bonds, and liabilities of approximately $1,045,000, including debentures outstanding of $309,000, and notes secured by mortgages of $679,042. The following reflects the yearend balance sheets of petitioner for each of the years 1945 through 1959: GORDON LUBRICATING COMPANY
End of year balance sheets
1945-1947
1945
1946
1947
Cash
$ 1,568.96
$ 22,372.86
$ 14,314.58
Notes and accounts receivable
24,304.96
175,056.62
199,808.05
Inventories
10,545.24
158,887.60
148,514.24
Other current assets
955.84
12,398.21
48,381.34
Other investments
Building, depreciable assets
40,586.04
187,989.82
516,242.54
Less: Amortization, depreciation
6,689.06
26,294.95
54,005.06
Net depreciable assets
$ 33,896.98
$ 161,694.87
$ 462,237.48
Land
1,500.00
Other assets
10,000.00
10,000.00
TOTAL ASSETS
$ 72,771.98
$ 540,410.16
$ 883,255.69
Accounts payable
$ 17,047.47
$ 106,026.41
$ 97,768.65
Notes
25,000.00
160,302.50
411,916.66
Other current liabilities
1,231.48
425.08
192.06
Debenture bonds due 1966
300,000.00
428,000.00
Mortgages and notes maturing
after 1 year
Other liabilities
113.85
Capital stock: Treasury stock
(771.50)
(500.00)
Common stock
22,100.00
22,100.00
22,700.00
*228 GORDON LUBRICATING COMPANY
End of year balance sheets
1945-1953
1945
1946
1947
Paid-in or capital surplus
Earned surplus
$ 8,164.53
$ (47,943.83)
$ (77,435.53)
TOTAL LIABILITIES AND CAPITAL
$ 72,771.98
$ 540,410.16
$ 883,255.69
1948
1949
1950
Cash
$ 32,893.16
$ 9,925.93
$ 24,913.61
Notes and accounts receivable
310,362.14
41,955.70
25,821.94
Inventories
142,243.18
22,529.59
8,405.74
Other current assets
21,025.21
16,556.47
14,927.89
Other investments
84,366.19
93,309.28
Building, depreciable assets
880,340.35
614,235.59
608,426.57
Less: Amortization, depreciation
108,986.53
46,203.64
69,578.26
Net depreciable assets
$ 771,353.82
$ 568,031.95
$ 538,848.31
Land
Other assets
10,000.00
716.97
TOTAL ASSETS
$1,287,877.51
$ 744,082.80
$ 706,226.77
Accounts payable
$ 231,211.55
$ 31,161.91
$ 32,523.15
Notes
561,601.68
441,340.00
426,352.77
Other current liabilities
37,442.30
30,278.36
27,473.60
Debenture bonds due 1966
500,000.00
262,000.00
262,000.00
Mortgages and notes maturing
after 1 year
Other liabilities
24.51
Capital stock: Treasury stock
(7,160.00)
(7,160.00)
Common stock
26,420.00
26,420.00
26,420.00
Paid-in or capital surplus
32,630.86
32,630.86
Earned surplus
(68,822.53)
(72,588.33)
(94,013.61)
TOTAL LIABILITIES AND CAPITAL
$1,287,877.51
$ 744,082.80
$ 706,226.77
1951
1952
1953
Cash
$ 42,169.23
$ 4,535.80
$ 10,895.33
Notes and accounts receivable
49,872.14
32,475.84
34,397.44
Inventories
13,109.10
14,394.18
11,163.38
Other current assets
8,072.68
7,182.92
7,261.25
Other investments
40,000.00
80,000.00
80,000.00
Building, depreciable assets
575,279.45
610,423.53
1,018,925.54
Less: Amortization, depreciation
70,439.21
90,578.60
124,401.12
Net depreciable assets
$ 504,840.24
$ 519,844.93
$ 894,524.42
Land
25,850.05
25,850.05
25,850.05
Other assets
15,284.40
16,165.60
6,048.80
TOTAL ASSETS
$ 699,197.84
$ 700,449.32
$1,070,140.67
Accounts payable
$ 34,770.24
$ 27,767.10
$ 165,411.80
Notes
498,013.86
513,493.82
765,251.91
Other current liabilities
7,041.50
7,289.83
13,965.05
Debenture bonds due 1966
187,000.00
187,000.00
187,000.00
Mortgages and notes maturing
after 1 year
Other liabilities
Capital stock: Treasury stock
(6,910.00)
(6,910.00)
(6,910.00)
Common stock
26,420.00
26,420.00
26,420.00
Paid-in or capital surplus
32,630.86
32,630.86
32,630.86
Earned surplus
(79,768.62)
(87,242.29)
(113,628.95)
TOTAL LIABILITIES AND CAPITAL
$ 699,197.84
$ 700,449.32
$1,070,140.67
*229 GORDON LUBRICATING COMPANY
End of year balance sheets
1954-1959
1954
1955
1956
Cash
$ 928.38
$ 4,417.90
$ 9,024.14
Notes and accounts receivable
48,981.23
37,207.42
71,357.12
Inventories
10,004.50
5,702.20
2,025.76
Other current assets
8,144.41
8,409.27
9,231.77
Other investments
80,000.00
80,100.00
80,100.00
Building, depreciable assets
1,027,529.66
1,050,211.13
1,069,817.13
Less: Amortization, depreciation
168,253.80
241,140.33
340,948.53
Net depreciable assets
$ 859,275.86
$ 809,070.80
$ 728,868.60
Land
25,850.05
25,850.05
25,849.05
Other assets
6,957.40
7,883.00
13,437.71
TOTAL ASSETS
$1,040,141.83
$ 978,640.64
$ 939,894.15
Accounts payable
$ 91,270.40
$ 84,199.33
$ 77,397.10
Notes
14,500.00
40,500.00
7,000.00
Other current liabilities
11,499.92
9,223.51
8,432.77
Debentuire bonds due 1966
187,000.00
207,000.00
207,000.00
Mortgages and notes maturing
825,798.78
726,545.67
720,112.40
after 1 year
Other liabilities
Capital stock: Treasury stock
(6,910.00)
(6,360.00)
(6,360.00)
Common stock
26,420.00
26,420.00
26,420.00
Paid-in or capital surplus
32,630.86
32,630.86
32,630.86
Earned surplus
(142,068.13)
(141,518.73)
(132,738.98)
TOTAL LIABILITIES AND CAPITAL
$1,040,141.83
$ 978,640.64
$ 939,894.15
1957
1958
1959
Cash
$ 29,130.79
$ 26,952.41
$ 34,427.33
Notes and accounts receivable
138,986.08
115,887.60
138,980.48
Inventories
2,449.31
3,056.10
4,863.12
Other current assets
11,751.80
9,261.72
10,301.69
Other investments
40,100.00
40,000.00
40,000.00
Building, depreciable assets
1,070,684.11
1,091,794.62
1,104,623.83
Less: Amortization, depreciation
420,319.20
503,749.41
588,203.63
Net depreciable assets
$ 650,364.94
$ 588,045.21
$ 516,420.20
Land
25,849.05
25,849.05
25,849.05
Other assets
20,661.96
20,149.12
20,000.33
TOTAL ASSETS
$ 919,293.93
$ 829,201.21
$ 790,842.20
Accounts payable
12,610.19
16,964.13
52,992.93
Notes
Other current liabilities
10,319.72
7,762.33
16,626.82
Debenture bonds due 1966
309,000.00
309,000.00
309,000.00
Mortgages and notes maturing
643,664.89
545,392.84
433,152.76
after 1 year
Other liabilities
Capital stock: Treasury stock
(6,030.00)
(3,840.00)
(3,840.00)
Common stock
26,420.00
26,420.00
26,420.00
Paid-in or capital surplus
31,783.36
30,140.86
30,140.86
Earned surplus
(108,474.23)
(102,638.95)
(73,651.17)
TOTAL LIABILITIES AND CAPITAL
$ 919,293.93
$ 829,201.21
$ 790,842.20
*230 Ultimate Findings The debentures were issued for a valid business reason, not primarily tax motivated. The debentures created a binding obligation on the corporation to pay a sum certain on a fixed date in the future, plus interest. The debentures were in substance what they were in form. There was no intent on the part of the stockholders to substitute the debentures for equity capital. Opinion In the notice of deficiency respondent disallowed the deductions for interest on the 4 1/2-percent debentures issued by petitioner claimed by petitioner on its returns for the years 1957, 1958, and 1959, in the amounts of $10,845.38, $13,905, and $13,905, respectively. Respondent also reduced or disallowed net operating losses claimed by petitioner on its returns for the years 1957, 1958, and 1959, in the amounts of $15,049.92, $6,922.75, and $22,369.96, respectively. The disallowance of the claimed net operating loss deductions results from the disallowance by respondent, for net operating loss carryforward purposes only, of deductions claimed by petitioner on its returns for 1952 through 1956 for interest on the debentures in the respective amounts of $8,415, $8,415, $8,415, *231 $9,114.67, and $9,315. The amounts of interest are not in dispute; the sole issue is their deductibility. A deduction is allowed under both section 163(a), I.R.C. 1954, and section 23(b), I.R.C. 1939, for "all interest paid or accrued within the taxable year on indebtedness." Petitioner argues that the interest paid on the corporate debentures in question is deductible because (1) the reason for issuing debentures rather than equity securities for new funds was the valid business purpose of preserving the relative equity in the corporation of a principal shareholder who could provide none of the needed funds, and (2) the debentures were debt obligations in both form and substance and were so treated by the corporation, its shareholders, and the debentureholders. Respondent maintains that the advances made to petitioner for its debentures were, as a matter of economic reality, placed at the risk of petitioner's business without reasonable expectation that repayment would be made regardless of earnings by petitioner. Respondent argues further that Gordon's contribution of service and know-how matched the money contributions of those who acquired debentures, *232 thus obviating the fact that debentures were not held in proportion to equity holdings. The lack of security, subordination of the indebtedness, and failure of petitioner to establish the sinking fund are also relied upon by respondent in arguing that outside lenders would not have loaned the money to petitioner under these circumstances. The question whether debentures represent true indebtedness or merely equity capital is one that has often been before the courts. It has been said that "for purposes of the federal tax statute, even though the parties have intended to create a debt, the courts will not recognize it as such as against the taxing power if they have failed to create a binding obligation"; that it is always open to inquiry whether the characterization urged by the taxpayer accords with substantial economic reality; and that for the taxpayer to be entitled to a deduction for so-called interest paid on debentures, he must show that the payment was of the kind Congress had in mind when it provided for the interest deduction. Gilbert v. Commissioner, 248 F. 2d 399 *233 (C.A. 2, 1957), remanding a Memorandum Opinion of this Court. This is to say that the determination whether the funds advanced are to be regarded as "capital contributions" upon which nondeductible dividends might be paid, or "loans" upon which deductible interest might be paid, must be made in the light of all the facts of the particular case. Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court on remand, certiorari denied 359 U.S. 1002 (1959). So we must approach this issue in the light of the facts in this particular case, bearing in mind, however, that we are simply attempting to apply an unequivocal provision enacted by Congress allowing a deduction for "all interest paid * * * on indebtedness." Although payments to a purported "creditor" who is also a stockholder in a closely held corporation should be carefully scrutinized, neither the statute nor any rule of law provides that payments made by a closely held corporation to its stockholders cannot be deducted as interest. Nassau Lens Co. v. Commissioner, 308 F. 2d 39 (C.A. 2, 1962), remanding 35 T.C. 268 (1960). However, *234 "To be deductible the amounts paid must, in fact, constitute interest - that is, compensation for the use or forbearance of money, Deputy v. du Pont, 308 U.S. 488 (1940) - paid with respect to genuine indebtedness. L. Lee Stanton, supra 34 T.C. 1 (1960)]." Joseph H. Bridges, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, 1963). Some of the recurrent factors that aid in the analysis of the facts in this case as they relate to the controversy before us are: (1) The form of the debentures, including a fixed reasonable date of maturity, interest rate, and an unqualified promise to pay both principal and interest. (2) Priority and nature of the claim in case of default in payment of interest and principal, including extent of subordination contemplated or provided for. (3) The capital structure of the corporation, especially as it relates to the type of business involved. (4) Provision for establishment of a sinking fund, and the extent to which the sinking fund is used to retire outstanding debt obligations. (5) The nature of the risk involved, and the possibility of repayment regardless of earnings and profits. (6) Whether *235 debentures are issued pro rata to stockholders, and the degree of control in management available to debentureholders. (7) Whether outside lenders, who are not interested in the profits or increase in equity of the corporation, would loan money under similar circumstances. (8) The intent of the parties, and the reasons for issuing debentures. (9) Whether there was a business purpose for financing through the use of debentures rather than stock, or whether this form of investment was used primarily for tax avoidance purposes. Any one of these criteria, standing alone, would not be determinative of the issue, and undoubtedly in other cases many factors not listed here would be of compelling significance. Leach Corporation, 30 T.C. 563 (1958). Suffice it to say that in the instant case, after carefully considering all the evidence presented, we are constrained to hold for petitioner on this issue. There is no question that in form these debentures represented a debt or indebtedness of the petitioner and required the payment of interest. They were regular in form and we find nothing unusual about the provisions thereof, and we find nothing unusual about the use *236 by corporations of subordinated debentures for raising money for short-to medium-term use. Likewise, there is little doubt that these debentures constituted a binding legal obligation against the petitioner to pay the face amount thereof plus accrued interest prior to any claims of stockholders. Furthermore, there has been no real default in any of the obligations under the debentures, except for the failure to create a sinking fund. However, such a fund was not scheduled to be started until 1952, and by that time the corporation had redeemed almost 50 percent of the bonds that had been issued (the bonds held by the Patterson group). While interest was at times in default, it was paid up to date by the years here involved and has continued to be paid as it became due. The debentures have always been treated in petitioner's books and records and in its dealings with outsiders as indebtedness. All interest accrued on the debentures up to the years here involved, and thereafter, has been paid. In short there could be little question that these debentures represented a genuine indebtedness of petitioner upon which genuine interest has been paid, except for the facts that the purchasers *237 thereof were, or were in some way related to, stockholders, and the debentures were subject to the risks of the business to some extent. This justifies an inquiry as to whether in economic reality the debentures were what they appeared to be and gave rise to an obligation within the intendment of Congress in allowing a deduction for interest. Knetsch v. United States, 364 U.S. 361 (1960). A brief review of the circumstances leading up to the authorization and issuance of these debentures, in our opinion, supports the testimony of petitioner's witness, McClintic, [4] that there was a valid business reason for issuing the debentures. Petitioner was formed in 1935 with very little cash equity capital. It apparently relied on borrowing to raise additional cash when it was needed, which was repaid with interest. It appears to have been moderately successful, operating in this manner on a small scale up until 1946. It was decided to expand petitioner's business in 1946 and this required a considerable amount of additional money. Petitioner sought a loan from its bank, and the bank agreed to loan it up to $300,000 provided petitioner raised an additional $300,000 from its *238 own sources. At this time petitioner's three principal stockholders were Gordon, McClintic, and Patterson, the former being the man who had started the business and who had the technical skill and knowledge to run it. But Gordon did not have the capital to put up his proportionate share of the $300,000. However, he refused to permit his equity interest to be diluted, so it was decided to issue the debentures so McClintic and Patterson could supply needed cash without disturbing the ratio of the equity ownership too much, and could also get their money back with interest as the business progressed. It is understandable that the debentures had to be subordinated to commercial bank loans because otherwise petitioner could probably not have obtained bank financing, which it needed. The interest rate of 4 1/2 percent might not have been high enough to attract an entirely unrelated investor but the debentures carried with them the right to subscribe to stock at par value, which would give the investor some voice in the management if *239 he decided to buy them, which, however, he was not required to do. Furthermore, we do not think the fact that an outside investor might not have been willing to buy these bonds makes them any less an indebtedness in the hands of stockholders, although it is a factor to consider. [5]
So far as we can determine from the record, these debentures were not subordinated to any specific bank loan until the subordination agreement was entered into in connection with the loan from Mellon in 1956. Prior to that time the debentures were at least on a par with claims of general creditors and were superior to those of stockholders. This made a difference here because the debentures were not held in proportion to stockholdings. In the event of liquidation the debentures would have to be paid first, even though they were held by stockholders, and this would in effect prefer some stockholders over others. [6] Evidence that this priority was real exists in the fact that $238,000 of these debentures were accepted by petitioner in the transfer of the Culligan business to *240 the Patterson group; and also, to some extent, from the fact that some of these debentures were held by banks in a fiduciary capacity, albeit with McClintic's consent and guarantee. While in the subordination agreement with Mellon, the debentureholders agreed not to assert their claims while the Mellon loan was outstanding, which might be said to subordinate them to general creditors to some extent, see P. M. Finance Corporation v. Commissioner, 302 F. 2d 786 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, these claims could be asserted with the consent of Mellon so we doubt that this restriction would have a serious practical effect in the event the business went completely sour. *241 Respondent's principal argument is that as a matter of economic reality the debentures were placed at the risk of petitioner's business without reasonable expectation that repayment would be made regardless of earnings by petitioner. It is true that the debentureholders could probably not have expected payment of the debentures in full had petitioner's business been unsuccessful. This would depend on the value of petitioner's assets in relation to the amount of prior claims. But we suppose this can be said with respect to most subordinated debentures or second and third lien indebtedness. However, these debentures were not placed at the risk of the business permanently or indefinitely, as would be stock. They were payable in full within a reasonable length of time, regardless of petitioner's earnings, except to the extent that lack of earnings would limit petitioner's ability to pay. We have no reason to believe they will not be paid when due - and Patterson's debentures, as well as $75,000 of the debentures held by the McClintic group, had been redeemed at face values prior to the years here involved. The ratio of debt capital to equity capital does raise a question whether the *242 money paid in for the debentures was in fact paid in as equity capital. However, this corporation has apparently been able to expand its business throughout its corporate life with the use of borrowed capital, from banks and other corporations as well as from stockholders, and we are not free to dictate the manner in which a taxpayer does its financing. If it is in substantial economic reality financed through borrowed capital, it is entitled to have this fact recognized for tax purposes. Leach Corporation, supra.On this record, we cannot ascribe an intent to petitioner's stockholders that these debentures be considered the same and on a par with petitioner's equity capital. We think they intended that the holders of the debentures would have a different beneficial interest in the business than would the holders of stock. See dissenting opinion of Judge Learned Hand in Gilbert v. Commissioner, supra, quoted with approval in Knetsch v. United States, supra.The debentures were preferred over stock in the payment of the face amount thereof plus interest, but could share only to the extent of the face value and the fixed interest rate in the event the business *243 was highly successful; and, per se gave the holders no voice in management. And finally there is no suggestion in this record that debentures were used instead of stock for tax avoidance purposes. In this era of tax consciousness it can usually be assumed that astute businessmen will consider the tax effect of carrying out a transaction one way as opposed to another, but it has long been recognized that this alone will not prevent the enjoyment of the tax advantages. Gregory v. Helvering, 293 U.S. 465 (1935). Here, however, we have no evidence that taxes were even considered when it was decided to issue these debentures. Certainly, this was not a contrived transaction for tax advantages alone, as were the transactions condemned in cases such as Gregory v. Helvering, supra; Knetsch v. United States, supra; Eli D. Goodstein, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959); Joseph H. Bridges, supra.Even though the debentures may have some of the aspects of equity capital, they were not shams, nor was the interest paid thereon. On the record as a whole we have concluded that these debentures *244 were issued for a business reason, not primarily tax motivated, that they created a binding obligation on the corporation to pay a sum certain on a fixed date and became a valid indebtedness of the petitioner, and that the interest paid on the debentures was in fact interest. Petitioner had the use of the money paid for the debentures, and the payments here involved were compensation for the use thereof. Deputy v. du Pont, 308 U.S. 488 (1940); compare Joseph H. Bridges, supra.We cannot disallow the interest deduction granted by Congress just because the debentures were issued to stockholders and related parties and have some of the attributes of equity capital. We hold for petitioner on this issue. Issue 2. Bad Debt Deduction Respondent determined that the deduction for bad debts in the amount of $40,000, claimed in petitioner's return for the calendar year 1958, was not an allowable deduction, as it represented a capital loss on investments in Norman Oil & Supply Co. Additional Findings of Fact On January 27, 1947, W. Wilson Norman (hereinafter referred to as Norman) formed the Norman Oil & Supply Co. (hereafter referred to as Norman Oil). Norman *245 Oil originally distributed tires, batteries, and Amalie Motor Oil in some 15 counties in central West Virginia. Gordon executed a contract with Norman Oil early in 1947, whereby California products processed by petitioner would be distributed by Norman Oil in this same area. Norman Oil became one of petitioner's largest retail distributors. Norman Oil did not have sufficient operating capital for the type of business it was in, where its customers frequently failed to pay their bills promptly when due. As a result Norman Oil became indebted to petitioner on open account for purchases from petitioner. In February 1948 petitioner loaned $20,000 to Norman Oil in return for a promissory note in that amount dated February 1, 1948. A second loan of $20,000 was made to Norman Oil by petitioner in July 1948, and petitioner received in return a promissory note in that amount dated July 30, 1948. At the same time petitioner also received 105 shares of Norman Oil stock. The shares were issued directly to petitioner in petitioner's name, but it was agreed between Norman and the officers of petitioner that the securities would be returned to Norman when the indebtedness of Norman Oil was paid. *246 It was also agreed that Norman would place the 209 shares of Norman Oil owned by him in escrow, keeping them in escrow until all past and presently due accounts were paid in full. This agreement also provided that Norman would receive 40 percent of net profits (before income taxes) as remuneration for his services, with a maximum limitation of $10,000 per year. The remaining net profit (less a reserve for income taxes) was to be paid to petitioner and another creditor "pro rata, until the amounts owing these two creditors, including interest, shall have been paid in full." The parties also agreed that Patterson and Gordon would be elected directors of Norman Oil. Subsequent to this agreement, Gordon was elected vice president of Norman Oil. On December 15, 1949, Norman Oil entered into a distributorship agreement with Cities Service to distribute its products in north-central West Virginia which was executed in behalf of Norman Oil by Norman and Gordon, as its officers. On December 30, 1949, petitioner entered into a subordination agreement with Cities Service wherein it was recited that petitioner was a stockholder and creditor of Norman Oil and that it would be to petitioner's *247 advantage to subordinate any and all claims it had or may have against Norman Oil to the indebtedness Norman Oil will owe to Cities Service under the distributorship agreement, and provided that petitioner did thereby subrogate all present and future indebtedness owed to it by Norman Oil to any indebtedness to be incurred by Norman Oil to Cities Service. Nothing in the agreement was to be construed to prevent Norman Oil from making payments to petitioner from time to time on account of indebtedness from Norman Oil to petitioner provided Norman Oil's account was not then delinquent. In 1951 after petitioner entered into its agreement with Cities Service, petitioner supplied Cities Service products to Norman Oil. On January 15, 1951, Gordon, in his capacity as vice president of Norman Oil, and William G. Kuenzig (hereafter referred to as Kuenzig) in his capacity as assistant treasurer of Norman Oil, signed a 30-day promissory note from Norman Oil to the order of Peoples, in the amount of $45,000. The note was endorsed by Gordon, acting in his capacity as president of petitioner, and by McClintic. On February 28, 1951, Norman Oil executed a demand promissory note of even date payable *248 to petitioner in the amount of $53,000, with interest at 4 percent payable monthly. This new obligation was in effect a consolidation of the following outstanding debts: (1) The amount of $2,766.19 due from Norman Oil on petitioner's special accounts receivable; (2) The amount of $7,033.81 due from Norman Oil on its general account; (3) The amount of $40,000 represented by the two notes of $20,000 each given to petitioner by Norman Oil in February and July 1948; and (4) Accrued interest of $3,200 on the two 1948 notes. At the same time Norman Oil executed this note, it also issued an additional 210 shares of stock to petitioner which brought the total number of shares of Norman Oil outstanding to 630. These shares were also issued directly to petitioner in its name. Norman agreed not to transfer or encumber the 310 shares of Norman Oil held by him until this note was paid. On March 23, 1951, petitioner paid the $45,000 note due to Peoples by Norman Oil. Prior to 1951 petitioner had at least three general ledger accounts in which it recorded transactions with Norman Oil. Account 130 was titled "Notes Receivable - Customers," and the two $20,000 notes received from Norman *249 Oil were debited to this account in April and August 1949, where they remained until credited out on February 28, 1951, when the $53,000 note was received from Norman Oil. Account 141 was titled "Accounts Receivable - Distributor - Not Pledged," in which the day-to-day transactions with Norman Oil appear to have been recorded. The debit balance in this account was $27,199.61 as of December 31, 1949, at which time it appears to have been closed out by transferring the debit balance to account 151 by a journal entry explaining that it was to transfer the balance of Norman Oil "Accounts Receivable - Trade to Account 151 - Accounts Receivable - Norman Oil * * * - representing investment in affiliated Company." The third account was account 151, titled "Accounts Receivable - Norman Oil & Supply Company (Special)." The debit balance in this account was $15,566.58 at December 31, 1949, at which time the $27,199.61 balance from account 141 was debited to this account, making a debit balance of $43,049.09 in the account as of January 1, 1950. The amount of $53,000 was debited to account 151 on February 28, 1951, "to record Note Receivable dated Feb…., 1951 received from Norman Oil." Also *250 on February 28, 1951, two entries were made to account 151; one debited the account for $40,000 and the other credited the account for $40,000, both with the explanation "315 shares Capital Stock - par $100 pr. share." The supporting journal entry bears the following explanation: To record the purchase of 210 shares of Capital Stock of Norman Oil and Supply Co., representing a Conversion of open Account Receivable due from Norman Oil & Supply Co. in the amount of $40,000. Including the 210 shares shown above the Company owns in addition 105 shares which were received from W. W. Norman, as consideration for the loan of $20,000 covered by Note dated 7/30/48. (See J.V.B. for conversion of this Note.) On March 23, 1951, this account was also debited with the amount of $45,000 as a result of the payment by petitioner of Norman Oil's note to Peoples on that date. This made a debit balance in this account of $138,000. Later in the year 1951, Cities Service agreed to loan Norman Oil approximately $250,000. In October 1951, Norman Oil paid petitioner a total of $98,163.34. This payment was made by two separate checks (both dated October 22, 1951), one in the amount of $53,088.34 (of which *251 $88.34 represented interest) and the other in the amount of $45,075 (of which $75 represented interest). On October 31, 1951, an entry was made in account 151, crediting it with $98,000, reducing the balance in this account to $40,000. [7] No further entries were made in this account until December 31, 1958, at which time it was credited with $40,000 and closed out. The journal entry supporting this latter entry explained that it was to expense the receivable from Norman Oil which became insolvent in 1958. Petitioner pledged the 315 shares of Norman Oil stock it owned to Cities Service, at the time Cities Service made the $250,000 loan to Norman Oil. Similarly, Norman pledged his shares in Norman Oil at the time the Cities Service loan was extended. Norman apparently experienced some degree of success in the Cities Service venture, because he was able to make regular *252 monthly payments on the debt, and by the end of 1954 he had repaid at least $150,000 of the loan made 3 years earlier. In 1955, Cities Service exercised an option it had placed in the original operating agreement with Norman Oil and terminated the distributorship arrangement with that company. Apparently Cities Service decided to conduct the business as a company operation, instead of operating through local distributors on a contract basis. The loss of the Cities Service business in 1955 coincided with a general decline in business for Norman Oil, and the venture was virtually abandoned in that year. In 1958, Cities Service reduced its claim (in an amount in excess of $98,000) to judgment and took possession of the few remaining assets of Norman Oil. The pledged shares of Norman Oil stock belonging to petitioner and to Norman were never returned by Cities Service. The year-end balance sheet shown on the income tax return of Norman Oil for the year 1950 reflected common stock in the amount of $42,000. The ending balance sheet on the return for 1951 reflected capital stock of $63,000 and "paid in or capital surplus" of $19,000. On petitioner's income tax returns for 1951, 1952, *253 1953, and 1954, in answer to the question whether petitioner owned 50 percent or more of the voting stock of another corporation, the information given was that it owned 50 percent of the stock of Norman Oil, acquired in February 1951. The balance sheet on petitioner's return for 1951 reflected "Other Investments" in Norman Oil of $93,309.28, and $40,000 on its returns for 1952 through 1954. In answer to the same question on petitioner's returns for 1955 and 1956, petitioner did not indicate ownership of 50 percent of Norman Oil, but statements attached to these returns reflected "Other Investments" of $40,000 in Norman Oil, $40,000 in McClintic-Gordon Co., and $100 in Norman Motor Sales Co.[8] The balance sheet attached to petitioner's 1956 return lists notes and accounts receivable of $71,357.12. In answer to the above question on petitioner's return for 1957 petitioner listed only its stock in Gordon-McClintic Co. and in Norman Motor Sales Co. The beginning balance sheet for the year 1957 reflects notes and accounts receivable *254 of $111,357.12, or $40,000 more than this item reflected in the closing balance sheet on the 1956 return. Kuenzig was petitioner's bookkeeper and accountant from 1949 to 1955. In 1955 petitioner employed other accountants to close its books and prepare its returns. The new accountants made the entries on petitioner's returns stated above reflecting a transfer of the $40,000 due from Norman Oil from an investment to a note or account receivable and the entry related above charging off the $40,000 in 1958. Petitioner never demanded payment of the $40,000 due from Norman Oil, and never sought to reduce its claim to judgment. The entire $40,000 was deducted by petitioner as a bad debt loss on its 1958 Federal income tax return. Ultimate Finding Petitioner converted $40,000 of its advances to Norman Oil into an investment in the stock of Norman Oil in 1951. Opinion In the notice of deficiency respondent determined that the $40,000 deduction for bad debts claimed on petitioner's return for 1958 was not allowable because it represented a capital loss on an investment in Norman Oil. Respondent's position on brief is that Norman Oil's indebtedness to petitioner, represented by *255 the two notes issued in 1948, was converted to an investment in the stock of Norman Oil in 1951 and the loss suffered in 1958 is therefore a capital loss. Respondent does not question the fact that the loss was incurred in 1958. Petitioner's argument is that the unpaid accounts receivable running from Norman Oil to petitioner and the advances evidenced by the notes from Norman Oil to petitioner created a debtor-creditor relationship which continued until Norman Oil became unable to pay, and that the stock of Norman Oil issued to petitioner in 1948 and 1951 was simply collateral to secure the indebtedness. Petitioner contends that when Norman Oil paid petitioner $98,000 in October 1951 it paid off the $53,000 note issued in February 1951 to consolidate Norman Oil's indebtedness to petitioner, including the two notes totaling $40,000, and that the balance left unpaid in the account represented indebtedness arising on open account. This is primarily a question of fact as to what the parties intended to do and actually accomplished by the transactions in 1951. In addition, we assume it could be argued that even if we conclude that the parties did not actually intend to convert the *256 indebtedness into an investment in 1951, their subsequent actions with respect to the $40,000 relegated it to the position of equity capital. However, our conclusion with respect to the first question obviates consideration of the second. The evidence gleaned from the books and records of both Norman Oil and petitioner, while not entirely consistent, goes far to support respondent's determination. There is little question that the amounts advanced by petitioner, either in the form of open accounts or cash advances, originally created an indebtedness. But the book entries and the testimony of Kuenzig, petitioner's bookkeeper, also make it pretty clear that the form of the investment was changed in 1951. The 210 shares of Norman Oil stock issued to petitioner in 1951 were registered in petitioner's name and there is no written evidence to contradict the apparent ownership of the stock by petitioner. Entries were made in petitioner's books indicating that at least $40,000 of the indebtedness was being converted to an investment in the capital stock of Norman Oil. For some reason this was not set up on petitioner's books in a separate investment account as were petitioner's investments *257 in Gordon-McClintic Co. and Norman Motor Sales Co., but Kuenzig apparently treated the entire account 151 as an investment account after 1951. In any event, starting in 1951 both Norman Oil and petitioner treated the $40,000 as an investment on their tax returns. Norman Oil increased its capital stock account by the $21,000 par value of the 210 shares and set up the balance of the $40,000 as paid-in capital. Petitioner consistently reported that it owned 50 percent of the stock of Norman Oil until it became apparent that Norman Oil could not stay in business, after which the $40,000 was switched to a receivables account on the balance sheet attached to the returns, although no adjusting entries were made to account 151. Norman Oil was one of petitioner's larger distributors and when petitioner entered into its agreement with Cities Service in 1951, Norman Oil became an even larger distributor of the products handled by petitioner. It would not be strange that petitioner's officers and stockholders would welcome the opportunity, or at least agree in order to help Norman Oil, to take a 50-percent equity interest in a related business which was apparently doing quite well at the time. *258 Gordon and McClintic became directors of Norman Oil, Gordon became its vice president, and Kuenzig became its assistant treasurer. Petitioner entered into a subordination agreement with Cities Service wherein it acknowledged itself as a stockholder of Norman Oil. Petitioner's officers arranged for a loan from Peoples to Norman Oil and petitioner paid it off when it became due. All of these things are pretty good evidence of an equity interest in Norman Oil. In support of petitioner's argument we have primarily the testimony of Norman and McClintic that the stock was issued as collateral for the indebtedness and that it was agreed that the stock would be returned to Norman (apparently individually) when the indebtedness was paid. We can give little weight to this evidence because there was nothing in writing to support it and even if Norman was to get the stock when the indebtedness was paid, it would appear that he would have to buy it either from petitioner or Norman Oil, because he had theretofore paid no consideration for it. We likewise can give little weight to petitioner's evidence that when the $5,000 debt of Norman Oil to another creditor, Young, was paid, Young transferred *259 the 5 shares of stock previously issued to him to Norman. Young did not testify and it may be that Young was anxious and willing to transfer his stock to Norman in order to get his money back. The fact that petitioner's account 151 was paid down only to an even $40,000 when Norman Oil borrowed $250,000 from Cities Service is also more readily understandable under respondent's theory of the situation. Cities Service may have been willing to have Norman Oil pay its indebtedness to other creditors but not to redeem its stock. While the evidence is not conclusive on this issue we find that the preponderance of it supports respondent's determination that the $40,000 indebtedness was converted to an equity investment in Norman Oil in 1951. Certainly petitioner has not presented enough evidence to carry its burden of proving that respondent's determination was erroneous. We hold for respondent on this issue. Issue 3. Depreciation Respondent reduced the deductions for depreciation claimed on petitioner's returns by the amounts of $31,312.52, $33,857.43, and $34,010.23 for the years 1957, 1958, and 1959, respectively. This resulted from respondent's determination that the useful *260 lives of the depreciable assets used at petitioner's McKees Rocks facility, other than buildings, [9] had a useful life in excess of that claimed by petitioner, and that the salvage value of those assets should be reduced for the years in question. Additional Findings of Fact For purposes of computing allowable depreciation on its depreciable assets at its McKees Rocks facility for the years here involved, petitioner placed all depreciable assets in one composite account, estimated a salvage value of 10 percent of cost first reduced by depreciation previously taken, and then employed a useful life of 6 years beginning in 1957 in computing depreciation for the years involved (or 16.667 of the undepreciated cost less salvage value). In his determination of allowable depreciation respondent used basically the same approach as petitioner except that he divided the depreciable assets into two composite accounts, one comprising property acquired prior to January 1, 1957, and the other comprising the same type of property acquired after that date; he estimated salvage value *261 at 5 percent of the cost basis of the property, reduced by depreciation previously taken on the assets acquired prior to 1957 and 5 percent of the cost of assets acquired thereafter; and then employed a useful life of 12 years beginning with 1957 for the assets acquired prior to 1957 and a useful life of 20 years for assets acquired after 1956. The useful life used by petitioner was related to the unexpired term of petitioner's operating agreement with Gulf as extended in 1957 (7 years beginning with 1956). Petitioner agrees that if the useful life of the assets is not to be related to the term of the lease respondent's determination is correct. Most of the facts relative to this issue are found in our general findings of fact. Of some importance is the information recited in the following table, which illustrates the change in petitioner's "sales" for the years 1955-59: Year
Cities Service[1]
Gulf Oil [1]
Other
Total
1955
$363,844.65
$32,614.13
$396,458.78
1956
170,622.75
$271,952.91
19,920.00
462,495.66
1957
53,118.96
420,781.79
27,678.50
501,579.25
1958
50,306.12
420,201.97
11,768.00
482,276.09
1959
41,724.31
475,361.95
28,810.50
545,896.76
*262 During the years 1957-59 petitioner expended the sum of $36,247.50 for additional plant and equipment at its McKees Rocks facility. Opinion Section 167(a), I.R.C. 1954, [10]allows a deduction for depreciation of assets used in a taxpayer's trade or business. The allowance is based on the useful life of the assets. It has been held that the "useful life" of an asset for this purpose is not necessarily the estimated physical life of the asset per se but must be "related to the period for which it may reasonably be expected to be employed in the taxpayer's business." Massey Motors, Inc. v. United States, 364 U.S. 92 (1960). See, also, sec. 1.167(a)-1(b), Income Tax Regs.[11]
*263 Petitioner contends that because of the conditions which had developed in its business by 1956 it was justified in adopting a useful life for its depreciable assets based on the original term of its contract with Gulf, because it had no assurance or reason to believe during the years here involved that Gulf would exercise its option to renew the contract for an additional 5 years, and if Gulf did not renew the agreement the assets at the McKees Rock terminal would no longer be useful to petitioner in its business. Respondent, on the other hand, argues that petitioner may not base the useful life of the assets on the initial term of the Gulf agreement, where Gulf had an option to renew and the assets had a useful physical life greater than the initial term of the agreement, unless petitioner had knowledge of facts during the taxable years from which it could reasonably believe that the contract with Gulf would not be renewed and that the assets would not be useful to it if the contract with Gulf was not renewed. In Lassen Lumber & Box Co., 6 B.T.A. 241 (1927), affd. 27 F. 2d 17 (C.A. 9, 1928), the Board of Tax Appeals held that *264 for a taxpayer to be entitled to recover the entire cost of assets (having a longer physical life) over the term of a contract, the taxpayer must show that there was a practical certainty that it could not use its assets for the purposes of its business after the expiration of such contract. The Court of Appeals, in affirming the Board, specifically approved this language and added that it must be shown by a preponderance of the evidence that the loss of use of the assets was reasonably or practically certain to take place at the end of the contract term. "A possibility or mere probability is not enough." In Westinghouse Broadcasting Co., 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963), a case involving renewal contracts, this Court stated: Once the identity of the renewed contract with the original contract for the purpose of establishing useful life is conceded, there remains to be determined the probable useful life of the contract with all its probable renewals. The probability of future renewals is a question of fact. Respondent thus determined *265 that the contract was reasonably certain of renewal indefinitely and the burden is upon petitioner to prove that determination in error. Petitioner must show more than uncertainty as to the length of the contract's useful life. [Cits. omitted.] The above rule was applied by this Court in Indiana Broadcasting Corporation, 41 T.C. 793 (1964), on appeal (C.A. 7, Aug. 10, 1964), although a different conclusion was reached because, unlike in Westinghouse, the taxpayer had supplied the evidence upon which the probable renewals could be determined. Turning, then, to petitioner's principal contention that the depreciable assets should be depreciated over the initial term of the Gulf agreement, at least until it was renewed, we think the burden is on petitioner to prove with reasonable certainty that the agreement would not be renewed. Otherwise petitioner will not have overcome the presumptive correctness of respondent's determination that the useful life of the assets will extend beyond the initial term of the contract. We do not think petitioner has carried this burden. Petitioner relies primarily on the fact that Gulf had refused to enter into a contract binding it *266 initially for a period longer than 5 years. But this loses a good bit of its force when viewed in the light of the evidence that petitioner negotiated a 2-year extension of the lease without much trouble just a year later, and also received two 2-month extensions because of strikes. It is only reasonable to believe that Gulf would continue to extend the agreement as long as petitioner's services were satisfactory. And we have no evidence in the record that would indicate that petitioner had not rendered or was not capable of rendering satisfactory services under the agreement. Petitioner's agreements with California and Cities Service had been terminated because the oil companies did not provide enough business to make petitioner's operation profitable. Petitioner obviously thought this would be corrected when it entered into the agreement with Gulf, and its experience soon proved this to be true. The only evidence we have as to Gulf's attitude about continuing the arrangement was the testimony of Gulf's district manager who indicated that so far as he knew, Gulf would continue the agreement as long as it was working out satisfactorily and that he did not know of any plans Gulf might *267 have had to terminate the agreement at the end of the initial term. Petitioner would in effect have us conclude that if there was a possibility that the agreement would not be renewed, or in the absence of evidence that it probably would be renewed, it had the right to depreciate its assets over the initial term of the lease. We think this would be misplacing the burden of proof, under the circumstances. Petitioner is attempting to limit the normal useful life of the assets and we think it must prove affirmatively that the probable useful life of the assets was so limited. Furthermore, we do not believe petitioner has carried its burden of proving that the assets would not have had a useful life in its business beyond the term of the Gulf contract even if the agreement was not renewed by Gulf. Petitioner had struggled through unprofitable arrangements with two other oil companies and had survived, and there is no reason to think it would have given up and abandoned the large investment in these assets even if the Gulf contract had been terminated. There were other oil companies operating in the area who might have used petitioner's facilities. The location of this terminal was *268 excellent - at the easternmost navigable point of the river and near an industrial hub. Furthermore, some of these facilities, such as the docks, tanks, furniture and fixtures, etc., could probably be used for other purposes, and there is no evidence that the entire plant could not have been converted to some other use had the Gulf contract been terminated. There is evidence that petitioner's plant was providing some services for Shell Oil Co. and Boron Oil Co., as well as being used for its own production, even during the years here involved. And, for what it may be worth, the evidence is that the Gulf agreement was renewed in 1960 for an additional 5-year term with an option in Gulf to renew for another 5 years. On the record as a whole petitioner has failed to carry its burden of proving that the useful life of its depreciable assets was limited to the initial term, as extended, of the Gulf contract. Consequently, we find for respondent on this issue. Issue 4. Amortization of Bond Discount Petitioner claimed deductions on its returns for 1957, 1958, and 1959 for amortization of the discounts at which it had issued its debentures to the McClintic trusts in June and October *269 1957, which respondent disallowed. The parties are in agreement that our decision on the first issue should control our decision on this issue. Since we concluded on the first issue that the debentures issued by petitioner represented indebtedness of the petitioner rather than an equity interest in petitioner, we hold for petitioner on this issue and find that respondent erred in disallowing the deductions for amortization of initial issue debenture bond discount. Decision will be entered under Rule 50. Footnotes
1. This case was heard by Judge Clarence V. Opper and briefs were duly filed. Judge Opper died on June 19, 1964. This case, not having been disposed of, was reassigned to Judge William M. Drennen, on January 11, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received and the parties agreed to the reassignment to Judge Drennen↩.
2. The name of petitioner was changed in 1943; but it was changed back to the original name again in 1946.↩
3. "RESOLVED FURTHER, That upon payment to the Company by or on behalf of Robert H. McClintic and E. J. Patterson, respectively, of the sum of $150,000 each, the Company shall cause to be issued to Robert H. McClintic $150,000 of such Debentures, and to E. J. Patterson, $150,000 of such Debentures; and "RESOLVED FURTHER, That the balance of the authorized Debentures, which balance aggregates the principal sum of $200,000, shall be offered to a restricted list of friends of or prospective investors in the Company; which list shall be approved by the Board of Directors; and "RESOLVED FURTHER, That any such person, upon the purchase of a Debenture or Debentures of the Company, shall be given the opportunity to subscribe for the new capital stock of the Company at the rate of 10 shares of the capital stock of the Company, of the par value of $1.00 per share, for each Debenture in the principal amount of $1,000 so purchased, the subscription price of such stock to be the sum of $1.00 per share; * * *"↩
4. Both Gordon and Patterson, the other two principal stockholders of petitioner when this action was taken, were deceased at the time of the trial.↩
5. Had the interest rate been fixed above a normal rate the payments thereof may have had more of the appearance of dividends.↩
6. Respondent argues that Gordon supplied petitioner with technical know-how and skills equal in value to the cash supplied by McClintic and Patterson and was therefore granted the option to purchase an additional 2,000 shares of stock at par. If this was the objective it would seem that Gordon should have been issued debentures for his services, because he had nothing to show for his contribution. McClintic and Patterson received both debentures and the right to subscribe to stock.↩
7. No explanation has been given as to why Cities Service permitted this reduction in an indebtedness that was supposedly subordinated by agreement dated December 30, 1949, to all debts and obligations due to Cities Service. Presumably one of the purposes for the $250,000 loan was to be payment of debts by Norman Oil.↩
8. The investments in McClintic-Gordon Co. and Norman Motor Sales Co. were reflected on petitioner's general ledger on separate investment accounts.↩
9. Hereafter when reference is made to "depreciable assets" it will be understood that buildings are excluded.↩
1. Title to products serviced by petitioner listed in the "Cities Service" and "Gulf" dollar sales columns remains at all times in Cities Service and Gulf Oil.↩
10. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, * * * ↩
11. Sec. 1.167(a)-1(b). Useful life. For the purpose of section 167↩ the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business * * *. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary * * *. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * *